

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

KDE:DGR/NJM/VTN/LRO
F. #2018R00788

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 25, 2021

By ECF

The Honorable Vera M. Scanlon
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   United States v. Moeleek Harrell, et al.,
            Criminal Docket No. 20-239 (S-3) (BMC)

Dear Judge Scanlon:

      The government respectfully submits this letter in advance of the Court's arraignment of the defendants on the charges in the above-captioned third superseding indictment (the "S-3 Indictment"). On February 17, 2021, a grand jury in the Eastern District of New York returned the S-3 Indictment, which consolidates three existing cases: United States v. Ayers, et al., 20-CR-239 (BMC) ("Ayers"), United States v. Harrell, et al., 20-CR-240 (CBA) ("Harrell"), and United States v. Johnson, 21-CR-16 (ARR) ("Johnson"). Of the 45 defendants charged in the S-3 Indictment, 35 were previously charged in Ayers, Harrell, and/or Johnson.[1] A number of those defendants were previously ordered detained pending trial.

      In addition to the 35 previously-charged defendants, the S-3 Indictment charges ten additional defendants: Kassin Appling, Johnny Chiles, Ronald Davis, Brittany Duncan, Nehemie Eril, Laron Estrada, Robert Holt, Darius Murphy, Terrell Ratliff and Jamel Smith. Those defendants were arrested this morning and are scheduled to appear before the

---

[1] Of those 35 defendants, 33 were previously presented and arraigned. The two remaining defendants are Romeo Gonzales and Tyquawn Lane—both charged in Ayers. Gonzales remains a fugitive, and Lane remains in custody in Maine, pending transfer to the Eastern District of New York. The government understands from the U.S. Marshals Service ("USMS") that travel by out-of-district defendants has been delayed due to the COVID-19 pandemic and by restrictions on new admissions to detention facilities used by USMS while transferring inmates.

Court later today, except for four who are incarcerated at Rikers Island and will be arraigned at a later date.

As set forth in the S-3 Indictment, multiple members and associates of the "Bully Gang," a New York-based street gang, were charged with racketeering offenses, including for their roles in numerous violent crimes. Among the crimes members and associates of the Bully Gang engaged in were two drug trafficking schemes: (1) a years-long drug trafficking scheme responsible for trafficking large amounts of cocaine base (also known as "crack"), heroin, and fentanyl between New York and Maine and (2) a scheme to smuggle drugs into New York City correctional facilities through, in part, the promise and payment of bribes to correctional officers.

The government respectfully submits this letter in support of its request for permanent orders of detention with respect to defendants Davis and Holt. As discussed below, Davis, a longtime member of the Bully Gang, and Holt, a longtime associate of the gang, were members of the sophisticated drug trafficking scheme between New York and Maine. Given the charges these defendants face, there is a presumption that "no condition or combination of conditions will reasonably assure the appearance of the [defendants] and the safety of the community." 18 U.S.C. § 3142(e)(3)(A). Defendants Davis and Holt cannot overcome this presumption and should be detained.

Moreover, as described below, defendants Eril, Duncan, Chiles and Murphy were participants in the scheme to smuggle drugs into New York City correctional facilities. The government submits that these defendants should not be released absent a substantial bond.

I. Background

   A. The Maine Drug Trafficking Conspiracy

The Maine drug trafficking conspiracy is described in detail in the Ayers Complaint (ECF No. 1), and prior court filings (ECF Nos. 11, 93). In short, the defendants operated a years-long, sophisticated drug trafficking conspiracy, responsible for trafficking large quantities of crack, heroin and fentanyl between New York and Maine, and laundering the proceeds of their drug trafficking activity through the U.S. financial system through, among other things, deposits, asset purchases and wire transfers. The co-conspirators ran multiple stash houses located throughout Maine, staffing each location with drug traffickers from New York—often members and associates of the Bully Gang—and with Maine residents who housed drug dealers and otherwise facilitated the conspiracy. The "trap" houses were placed throughout Maine and changed from time to time to attempt to evade law enforcement scrutiny. On June 25, 2020, law enforcement agents executed multiple arrest and search warrants, including at four stash houses in Maine and one stash house in New Jersey. During the execution of those search warrants, agents discovered and seized evidence of the conspiracy, including large quantities of drugs, narcotics packaging paraphernalia, surveillance detection equipment, hundreds of thousands of dollars in cash, and assorted firearms and ammunition.

While in Maine, the New York-based co-conspirators frequently communicated with Derrick Ayers and Bermon Clarke, leaders of the conspiracy, to coordinate their drug supply and the transfer of drug trafficking proceeds.[2] Drug dealers stationed in Maine would often provide drug counts to Ayers and Clarke, informing them how much crack ("up" or "u") or heroin ("down" or "d") was left at their respective trap houses. The co-conspirators would also use designated cellular telephones assigned to each stash house to conduct drug transactions and communicate with one another. These "trap" phones were frequently replaced and recirculated in an effort to evade law enforcement detection.

The defendants were also sophisticated in how they transported their contraband, using multiple vehicles equipped with concealed compartments, also called "traps," that were professionally installed within the vehicle. When installed, the vehicle's interior appeared normal when the compartments were closed. The compartments were opened by hydraulic lifts that an occupant triggered using a complex string of commands entered via switches for the vehicle's headlights, radio, windows, among other things. The defendants used multiple vehicles with such compartments, including a 2018 Volvo S90 frequently used by Clarke, from which a firearm and more than $100,000 in cash were recovered, a 2020 Hyundai Sonata frequently used by Ayers, from which three firearms were recovered, a 2016 Ford Fusion, from which 60 grams of crack were recovered, and a 2014 Kia Cadenza, from which a .38 caliber revolver and magazine were recovered.

The defendants' drug trafficking conspiracy also involved the laundering of drug trafficking proceeds. The defendants went to considerable lengths to conceal the proceeds of their operation, using intermediaries to handle the money and act as nominee owners in multiple financial transactions involving proceeds of the drug trafficking conspiracy. Proceeds were laundered, for instance, through direct cash deposits and wire transfers to co-conspirators through intermediary bank accounts, and through the acquisition of assets, such as luxury vehicles.

B.  The Rikers Island Drug Trafficking Conspiracy

Harrell, Appling, Estrada, Ratliff and Smith were inmates at Rikers Island, a complex of correctional facilities operated by New York City Department of Correction ("DOC") for parts of 2019 and 2020. They conspired with others, including Harris, Kennedy, Eril and Duncan, to smuggle sheets of papers soaked in a synthetic cannabinoid known as "K2" into Rikers Island by mail or in person by third parties.

Chiles and Murphy—while employed as DOC officers—accepted cash bribes from certain defendants and their associates in exchange for smuggling K2-soaked papers

---

[2]  As set forth in the Ayers Complaint, pursuant to judicially authorized search warrants, law enforcement has seized information from electronic backups of cellular telephones used by Clarke and Ayers in furtherance of the charged crimes. Excerpts of messages seized from those devices are included herein.

into Rikers Island. Once inmate-defendants received the K2-soaked papers, they sold smaller quantities of the K2-soaked papers to other inmates at a substantial profit. Associates of the inmate-defendants collected thousands of dollars from their drug trafficking activities and used those proceeds to purchase more K2 and continue smuggling contraband into Rikers Island.

II.     Legal Standard

   A.     The Bail Reform Act

The Bail Reform Act empowers federal courts to order a defendant's detention pending trial where the government establishes by clear and convincing evidence that the defendant is a danger to the community or, by a preponderance of the evidence, that he represents a risk of flight. See 18 U.S.C. § 3142(e); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987). Where, as here, there is probable cause to believe that an individual committed an offense under the Controlled Substances Act that is punishable by a term of imprisonment of ten years or more, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community. See 18 U.S.C. § 3142(e)(3)(A).

Where a presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by coming forward with evidence "that contradicts notions of flight risk or dangerousness." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). A bail package sufficient to overcome a presumption of flight may not be enough to overcome a presumption of dangerousness. United States v. Rodriguez, 950 F.2d 85, 89 (2d Cir. 1991).

Moreover, it is well established that, even if a defendant can meet his burden to rebut this presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight, the presumption favoring detention "does not disappear entirely, but remains a factor to be considered among those weighed by the district court." United States v. Mercedes, 254 F.3d 433 (2d Cir. 2001); see also United States v. Martir, 782 F.2d 1141, 1144 (2d Cir. 1986) (presumption of risk of flight); Rodriguez, 950 F.2d at 88 (presumption of dangerousness).

In order to determine whether the presumptions of dangerousness and flight are rebutted, the district court is directed to consider the factors enumerated in 18 U.S.C. § 3142(g), specifically: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant, including family ties, employment, community ties and past conduct; and (4) the nature and seriousness of the danger posed by the defendant's release.

Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000)

4

(government entitled to proceed by proffer in detention hearings); Ferranti, 66 F.3d at 542 (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same). As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffers. See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

III. Argument

Defendants Davis and Holt are each charged with participating in a crack, heroin and fentanyl distribution conspiracy, carrying a sentence of at least ten years' imprisonment. As such, they are presumed to pose both a danger to the community and a risk of flight, and there is a presumption that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] and the safety of the community." 18 U.S.C. § 3142(e)(3)(A); see also Harmelin v. Michigan, 501 U.S. 957 (1991) 1002–03 (Kennedy, J., concurring) (observing that the characterization of drug possession with intent to distribute as "nonviolent and victimless [crime] is false to the point of absurdity" given "pernicious effects" of drug use); see generally United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985) (recognizing that statutory concern with regard to dangerousness to community is not limited to acts of violence, but also includes "the harm to society caused by narcotics trafficking"). As discussed below, defendants Davis and Holt cannot rebut this presumption and must be detained pending trial.

With respect to the Rikers Island drug trafficking conspiracy, defendant Eril presents a danger to the community and a risk of flight that cannot be offset absent a substantial bond. As discussed below, Eril's involvement in the conspiracy was extensive and well-documented, and her travel history and financial resources render her a risk of flight.

**Defendants Who Should Be Detained Pending Trial**

A.  Ronald Davis, also known as "Ronno"

Davis is a longtime member of the Bully Gang who publicly touts his membership in the gang. For instance, as far back as 2017, Davis appeared in videos posted about the Bully Gang. In that 2017 video, Davis can be heard promoting the gang ("we

Bully Gang from the Stuy, you heard") and referencing incarcerated members ("Free Buzzin," a reference to the slang term for cousin, used among members of the Bully Gang). He is also present while other gang members recount the history of the gang, discuss its founders and boast about crimes committed by fellow gang members, including robbery, carjacking, and murder. Davis's Facebook account is also registered under the username "Ronno Twosevv"—which includes a common reference used by members to refer to the gang using the second and seventh letters of the alphabet, "B" and "G."

Davis has a serious criminal history, including multiple firearm-related felony offenses. He was first arrested in 2013 and charged with criminal possession of a firearm in New York State court. Davis ultimately pleaded guilty to attempted criminal possession of loaded firearm and sentenced to one year of imprisonment. Less than one year later, he was again arrested and subsequently convicted of criminal possession of a firearm. Following his release from incarceration, Davis was arrested in 2017 on grand larceny charges in Virginia.

Davis's membership in the Maine drug conspiracy is confirmed by powerful electronic evidence. For instance, text messages exchanged with defendant Bermon Clarke, one of the conspiracy's leaders, show that, in May 2020, Davis traveled from New York City to Maine to operate a stash house to store and sell narcotics. Davis's travel is also reflected in historical cell-site records. Following his arrival in Maine, Davis communicated with Clarke in order to obtain the password for the designated "trap phone" at the stash house, which Clarke provided. During Davis's stay, members of the conspiracy exchanged messages regarding quantities of money and narcotics at the trap house that Davis operated in Garland, Maine. Law enforcement later recovered more than 160 grams of crack, more than 98 grams of fentanyl and various drug paraphernalia, among other things, at that location.

If convicted, Davis faces a substantial sentence and therefore has a powerful incentive to flee. Accordingly, given his professed gang membership, his criminal history, and the strength of the evidence against him, Davis should be detained pending trial as both a risk of flight and danger to the community.

B. Robert Holt, also known as "Ricky" and "Ghost"

Holt is a Bully Gang associate with considerable and longstanding involvement in the Maine drug conspiracy.

Holt's criminal history includes a 2006 arrest with Derrick Ayers, one of the leaders of the Maine drug conspiracy, for second-degree robbery (displaying what appears to be a firearm) and second-degree criminal possession of a weapon. He pleaded guilty in 2007 to attempted robbery in the second degree, a felony conviction. During the probation period that followed, at least two bench warrants were issued—one in 2009 and one in 2011.

Holt's involvement in the Maine conspiracy was not limited to drug trafficking activity. For instance, on or about October 2, 2018, Holt sent Ayers a video depicting Ayers electrocuting a woman ("Victim-1") with an electronic, Taser-like device. After Ayers

began to electrocute Victim-1, Victim-1 fell, screamed in pain, and repeatedly yelled, "please don't," "stop," and "sorry," as Ayers continued to electrocute her. Ayers was encouraged by someone off-camera, who could be heard saying, "That wasn't enough. That wasn't enough." Ayers continued electrocuting Victim-1 and a man's voice can be heard saying, "no fucking games."

In June 2020, multiple defendants were arrested on the initial indictments in Ayers and Harrell, including defendants Moeleek Harrell, Derrick Ayers, and Paul Harris. The same day, multiple searches were conducted at locations used by the participants in the drug trafficking schemes. On July 7, 2020, Harris called Holt over a recorded telephone at the Metropolitan Detention Center. During that call, Holt inquired about the "conspiracy charge" and whether Harris knew other potential targets in the case, and said he expressed concern about law enforcement surveillance.

The S-3 Indictment charges Holt with conspiring to distribute and possess with intent to distribute narcotics, including crack, heroin and fentanyl. If convicted, he faces up to 20 years' imprisonment. Holt therefore cannot rebut the presumption that no condition or combination of conditions will reasonably assure his appearance and the safety of the community. He should be detained pending trial.

**Defendants Who Should Be Detained Absent a Substantial Bond**

Defendants Eril, Duncan, Chiles and Murphy should not be released absent a substantial bond. Duncan was one of the defendants who smuggled drugs into Rikers Island, while Chiles and Murphy accepted bribes as DOC Correctional officers in furtherance of the scheme.

Eril's involvement in the Rikers Island drug trafficking conspiracy was even more substantial. Eril is the longtime romantic partner of Bully Gang founder Moeleek Harrell. Her involvement in the drug conspiracy is largely evidenced from audio recordings of calls made to her by Harrell and other inmates at Rikers Island. She coordinated deliveries of K2-soaked papers among members of the conspiracy and personally delivered cash to co-conspirators to pay for K2-soaked papers and to bribe corrections officers. While Harrell was the leader of the conspiracy, he was incarcerated and therefore relied heavily on Eril to direct others and control the profits from their drug trafficking operation. Financial records reveal that during the four-month period between February and May 2020, Eril received more than $48,000 from online money transfers in furtherance of the drug trafficking conspiracy.

Moreover, in the past several months, Eril has traveled repeatedly outside of the United States; she went to Mexico in October 2020, St. Barts in November 2020 and The Bahamas in January 2021. Because Eril has access to large sums of cash that could allow her to easily flee, the government submits that a substantial bond is required to assure her appearance during the pendency of the case.

7

IV. Conclusion

For the foregoing reasons, the government respectfully requests that the Court enter permanent orders of detention, or require substantial bail packages, as outlined above.

Respectfully submitted,

SETH D. DuCHARME
Acting United States Attorney

By:         /s/
Drew G. Rolle
Nicholas J. Moscow
Virginia T. Nguyen
Lindsey Oken
Assistant U.S. Attorneys
(718) 254-7000